*million, or $2.00 per diluted share in the first quarter of the last fiscal year.* Excluding charges for inventory impairments and abandonment of land option contracts, adjusted net income was $15.9 million, or $0.41 per diluted share.

– Home closings: 2,660 homes, compared to 3,829 in the first quarter of the prior year.

– Total revenues: $803.0 million, compared to $1.1 billion in the first quarter of the prior year.

– New orders: 1,779 homes, compared to 3,872 in the first quarter of the prior year.

– Lots under control totaled 83,422 at 12/31/06, a 22% decline from the prior year.

– Unsold homes under construction declined 27% from the fourth quarter of fiscal 2006.

– Backlog at 12/31/06: 4,221 homes with a sales value of $1.29 billion compared to 9,276 homes with a sales value $2.78 billion in the prior year.

*"Operating conditions remained extremely challenging for the housing industry during our first quarter of fiscal 2007,"* said President and Chief Executive Officer, Ian J. McCarthy. "Most markets across the country continue to experience lower levels of demand for new homes, high cancellation rates and significant levels of discounting. At this point, we have yet to see any meaningful evidence of a sustainable recovery in the housing market, although we would expect to gain a better read on the market as the traditional spring selling season gets underway."

*Total home closings of 2,660 during the first quarter were 31% below the prior fiscal year's first quarter record.* Net new home orders totaled 1,779 homes for the quarter, a decline of 54% from the first quarter record of the prior fiscal year, resulting from both reduced demand across the Company's markets and a higher rate of cancellations at 43%, compared to a more historically normal level of cancellations at 26% in the prior year's first quarter. However, the cancellation rate was lower sequentially from 57% in the fourth quarter of fiscal 2006.

"During the first quarter, historically our weakest in terms of new orders and closings, we prioritized those initiatives aimed at both strengthening our financial capabilities and positioning us for an anticipated increase in activity as we enter the spring selling season. These initiatives include implementing overhead reductions, converting existing backlog into closings and reducing unsold home inventories,"

McCarthy continued. "We believe this disciplined approach, coupled with our broad geographic and product diversity, will position us well for a continuing difficult market environment and the eventual upturn. We maintain that the long-term industry fundamentals, based on demographic driven demand and employment trends, together with further supply constraints, remain compelling."

"We remain focused on reducing costs throughout our business and enhancing liquidity as this challenging business environment continues," said James O'Leary, Executive Vice President and Chief Financial Officer. "We have aligned our overhead structure with our reduced volume expectations in fiscal 2007. We have proactively reduced our controlled lot count by over 20% compared to the prior year, by eliminating non-strategic positions to align our land supply with our current expectations for home closings. These steps are intended to maintain our strong balance sheet and liquidity so that we are in a position to capitalize on those future opportunities that will generate meaningfully higher returns when the housing market recovers."

During the first quarter, operating margin was negatively impacted by higher market driven sales incentives and reduced revenue as compared to the same period a year ago. In addition, the Company incurred pre-tax charges to abandon land option contracts and to recognize inventory impairments of $25.2 million and $94.7 million, respectively. As previously disclosed, the Company also incurred approximately $4.0 million in severance costs during the first quarter of fiscal 2007 related to the alignment of its overhead structure.

Fiscal 2007 Outlook

The current market environment continues to be characterized by weak demand, with heavy discounting required to drive meaningful sales volume. While this could improve as the year progresses, the Company currently believes that the low end of its previously announced outlook of 12,000 - 13,500 closings is now a more reasonable target in fiscal 2007. At this level of closings and the current conditions in the marketplace, the Company currently expects fiscal 2007 diluted earnings per share to be in the range of $1.25 - $1.50 prior to any impact of inventory impairments and abandonment of land option contracts.

During this period, the Company will focus on maintaining balance sheet strength, continue to reduce costs, and maximize its financial resources to better position the Company to take advantage of those opportunities that will arise when conditions stabilize. Steps taken to date to align the Company's cost structure with the current environment are consistent with the Company's goal to be in the top quartile of its peer group with respect to margins and returns.

## THE TRUTH IS REVEALED

51.    Only three weeks later, on February 14, 2007, the Company terminated the employment of defendant Gary for "a pattern of personal conduct which includes violations of company policies."

52.     On March 18, 2007, *The Charlotte Observer* reported:

Mark and Lea Tingley bought a new home in 2001 in a subdivision called Southern Chase. Photos on the family computer show a smiling young couple holding a baby girl in a bare room.

They recall feeling surprised they could afford a house.

And thrilled. It was their first home, their largest investment, in the neighborhood where they planned to raise a family.

Beazer Homes USA built the Tingleys' home. Southern Chase was a new kind of subdivision for Beazer, an experiment in selling low-cost homes to low-income families.

The strategy was a financial success for Beazer.

But the neighborhood fell apart.

Seventy-seven buyers have lost homes to foreclosure in a subdivision of 406 homes. That's about one in five, more than six times the national rate.

Some homes sat empty. Others became rentals. Prices dropped.

Standing in his side yard last fall, Mark Tingley pointed to holes in his siding, garbage in neighboring yards, overgrown lawns, junked cars. He feels angry, cheated and trapped.

"We were just so happy," he said. "Now, no one is happy."

The buyers in Southern Chase share responsibility for the decisions they made.

***But an Observer investigation found Beazer acted in ways that made a high rate of foreclosures inevitable. Beazer not only built the homes in Southern Chase, it arranged mortgage loans for two-thirds of the buyers.*** The company used that control to arrange larger loans than some buyers could afford. That allowed it to include the cost of financial incentives in the price of homes.

***Some of Beazer's actions violated federal lending rules, the Observer found.***

Beazer said its practices in Southern Chase were "in strict compliance with federal, state and local laws and regulations." The company said in a written statement that the foreclosures were mostly due to economic difficulties experienced by the buyers.

"Beazer is committed to providing quality homes of superior value," the letter read in part.

The company's CEO, Ian McCarthy, declined to speak with the Observer.

The Federal Housing Administration, which insured most of the mortgage loans, failed to address the problems. The government has paid

more than $5 million to cover defaulted loans in Southern Chase. It continues to insure new Beazer loans.

The Department of Housing and Urban Development, which administers the FHA program, told the Observer it was not aware of the problems in Southern Chase and did not plan to investigate the loans it insured for buyers there.

Demand 'hot as a match'

The night before Southern Chase opened in 1997, people camped outside the sales office, waiting to pick the best lots.

Home prices started below $80,000, roughly half the Charlotte-area average. Demand was "hot as a match," said Barry Helms, the sales agent who greeted them. He remembers selling six or seven homes the first day.

The unusually low prices were a strategic decision for Beazer. Too many companies were building homes in the Charlotte area for traditional first-time owners, the company said in its 1997 annual report. Beazer's answer was to build and sell homes for less.

\* \* \*

Beazer, which operated in the Carolinas at the time as Squires Homes, chose a site off N.C. 49 in Concord, where land was still relatively cheap.

The subdivision is 15 minutes from Lowe's Motor Speedway, so Beazer gave racing names to the streets: Winners Circle, Rockingham Lane. It built vinyl-sided homes on small lots, mostly one story, an average of 1,327 square feet.

Contractors did the building. Beazer focused on marketing. It held pizza parties at nearby apartment complexes. It took tenants to see homes.

"We believe in the dream," read a Beazer flier distributed to apartments in Concord. "We believe that everyone deserves to own their own home."

*But as the company pushed to find new buyers, it increasingly crossed the line between selling to people who could barely afford homes, and selling to people who couldn't.*

\* \* \*

Costly loan maneuvers

The Tingleys moved into their new home in April 2001. Lea cleared out her 401(k) to pay $2,500 toward closing costs.

The keys came in a manila envelope with instructions on the front:

"1)    Dump on table.

> 2)     Place key on ring.
>
> 3)     Do the 'Happy Dance' (Jump up and down shouting wildly.)"

The thrill did not last.

Lea had applied for the loan without Mark because he had credit problems.

She omitted from her application a monthly payment of $350 on a leased Dodge Avenger.

Lea said a Beazer employee told her to do it because the application also didn't include Mark's income.

"At the time it made sense to me and I was just excited about owning the home," Lea said. She says she knows she shouldn't have omitted the payment, but she trusted the employee.

Loan documents show that Beazer Mortgage prepared a final version of Lea's application before the closing. On that final version, Lea's monthly income was overstated by $187. It had been correct on the original application Lea signed. It is unclear when the number changed.

FHA rules required Beazer to document the borrower's income and debts. Lea's credit report and W-2 show the accurate numbers.

Knowingly falsifying information on a loan application is a federal crime.

Lea says she didn't notice the change until the Observer pointed it out this fall.

The company did not respond to The Observer's written questions about the loan.

The changes allowed Lea to qualify for the loan she needed.

But in the summer of 2001, three months after buying the home, Lea called the dealership and asked to have the Avenger repossessed. She could not afford the car and the mortgage.

53.     On March 21, 2007, Beazer announced the resignation of defendant O'Leary, the Company's CFO.

54.     Then, on March 27, 2007, the Individual Defendants caused or allowed the Company to issue a press release in reply to the *Observer's* allegations of mortgage fraud, titled "Beazer Homes Responds to Media Reports." The press release stated in part:

In response to media reports and inquiries into the possibility of a federal investigation of the Company in connection with alleged mortgage fraud, Beazer Homes USA, Inc. has the following response.

At this time, Beazer Homes can not comment on or verify any investigation. However, we will fully cooperate with any investigation by any government agency.

55.    On March 28, 2007, after the Individual Defendants' inadequate explanation of the federal investigations into its loan practices, Beazer's value collapsed $2.64 per share to close at $28.77 per share, a one-day decline of 9%.

56.    The Individual Defendants knew and consciously disregarded, were reckless or grossly negligent in not knowing or should have known but improperly concealed the true facts. Those facts were as follows:

(a)    the Individual Defendants caused the Company to engage in reckless lending practices before and during the Relevant Period that coupled with the Company's lack of internal controls over its lending procedures, would lead to numerous foreclosures and other problems;

(b)    the Company's business growth was primarily attributed to its reckless lending practices to low-income borrowers with poor credit histories;

(c)    many of the Company's buyers would not be able to pay their loans after the first two years because they lacked sufficient income or credit, which would lead to decreased sales and earnings and numerous foreclosures; and

(d)    given the increased volatility in the mortgage lending market, the Company had no reasonable basis to make optimistic projections about its 2007 results.

57.    As a result of the Individual Defendants' improper statements, Beazer's stock price traded at inflated levels during the Relevant Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales of the Company's shares sending them down 40% from their Relevant Period high.

58.    As a result of the Individual Defendants' actions, from before the commencement of the Relevant Period to the present, Beazer's market capitalization has declined by over $470 million.  At the same time that the Individual Defendants were causing Beazer to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $10 million of their personally held stock.

## DAMAGES TO THE COMPANY

59.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to engage in overly aggressive lending practices, disseminate false and misleading statements, and misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action lawsuits that allege violations of the federal securities laws.

60.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Beazer's market capitalization has been damaged by over $470 million. At the same time that the Individual Defendants were causing Beazer to suffer such devastation of its market capitalization, the Insider Selling Defendants were profiting by selling over $10 million of their personally held stock.

61.    Further, as a direct and proximate result of Individual Defendants' actions, Beazer has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)    Costs incurred responding to investigations currently being conducted by the IRS, the Justice Department, and the Department of Housing and Urban Development, and the FBI including legal fees paid to outside counsel;

(c)  Costs incurred in investigating and defending Beazer and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment; and

(d)  Costs incurred from compensation, severance and benefits paid to the defendants who have breached their fiduciary duties to Beazer.

62.  Moreover, these actions have irreparably damaged Beazer's corporate image and goodwill.  For at least the foreseeable future, Beazer will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Beazer's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## ILLEGAL INSIDER SELLING

63.  While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Beazer stock:

| Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| ALPERT | 11/14/2006 | 16,000 | $43.19 | $691,040.00 |
| | | **16,000** | | **$691,040.00** |
| | | | | |
| MCCARTHY | 11/14/2006 | 179,535 | $43.07 | $7,732,572.45 |
| | 9/25/2006 | 6,802 | $40.83 | $277,725.66 |
| | | **186,337** | | **$8,010,298.11** |
| | | | | |
| O'LEARY | 11/13/2006 | 33,549 | $42.86 | $1,437,910.14 |
| | 3/23/2007 | 17,394 | $33.78 | $587,569.32 |
| | | **50,943** | | **$2,025,479.46** |
| | | | | |
| **Total** | | **253,280** | | **$10,726,817.57** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.  Plaintiff brings this action derivatively in the right and for the benefit of Beazer to redress injuries suffered, and to be suffered, by Beazer as a direct result of the breaches of fiduciary duty, abuse of control, waste of corporate assets, unjust enrichment and violations of the Exchange Act, as well as the aiding and abetting

thereof, by the Individual Defendants. Beazer is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

65.    Plaintiff will adequately and fairly represent the interests of Beazer in enforcing and prosecuting its rights.

66.    Plaintiff is and was an owner of the stock of Beazer during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

67.    The current Board of Beazer consists of the following seven individuals: defendants Alpert, Bayne, B. Beazer, Leemputte, Solari, Zelnak and McCarthy. Plaintiff has not made any demand on the present Board of Beazer to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons.

68.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the improper statements.    While in possession of this material adverse non-public information regarding the Company, the following current members of the Beazer Board participated in the illegal insider selling:

(a)    During the Relevant Period, while in possession of adverse non-public information regarding Beazer's reckless lending practices and lack of internal controls, McCarthy sold 186,337 of his personally held shares for $8,010,298.11;

(b)    During the Relevant Period, while in possession of adverse non-public information regarding Beazer's reckless lending practices and lack of internal controls, Alpert sold 16,000 of his personally held shares for $691,040.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.    Moreover,

these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

69.     During the Relevant Period, defendants O'Connell, Alpert and Leemputte were members of the Audit Committee. The Audit Committee is responsible for general oversight of the accounting and financial reporting process of the Company and audits of its financial statements, including: (i) the Company's systems of internal controls; (ii) the Company's compliance with legal and ethical requirements; (iii) the qualifications and independence of the Company's independent auditors; (iv) the Company's financial risk; and (v) the performance of the Company's internal audit function. Thus, the Audit Committee was responsible for overseeing and directly participating in Beazer's internal controls, accounting practices and financial reporting process. Defendants O'Connell, Alpert and Leemputte breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee participated in the preparation of improper financial statements and earnings press releases that contained false and/or misleading material information. Furthermore, the Audit Committee failed to ensure that the Company had in place requisite internal controls over its lending practices to prevent the Company from making loans to unqualified persons. Finally, these defendants reviewed and failed to correct Beazer's improper press releases described more fully herein. As a result, Beazer has been forced to revise its first quarter 2007 financial results and is under investigation by the IRS, the Justice Department, the Department of Housing and Urban Development, and the FBI. Therefore, defendants O'Connell, Alpert and Leemputte face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

70.     The Compensation Committee of the Board determines the compensation of the Company's executives and directors. The Compensation Committee's responsibilities include reviewing and approving corporate goals and objectives

- 33 -

relevant to CEO compensation, evaluating the CEO's performance, determining and approving the CEO's compensation level, reviewing and establishing appropriate compensation for members of the Board, preparing the annual report on compensation, and administering the Company's equity and other compensation plans. The Compensation Committee is comprised of defendants Solari, Bayne and Zelnak. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Solari, Bayne and Zelnak. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Alpert, B. Beazer, Leemputte and McCarthy is futile.

71.    The principal professional occupation of defendant McCarthy is his employment with Beazer, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, in 2006, Beazer paid defendant McCarthy $1,200,000 in salary, $7,133,653 in bonus, $12,479,980 in restricted stock awards, $792,808 in other compensation and 427,676 options. Accordingly, defendant McCarthy lacks independence from defendants Solari, Bayne, and Zelnak, interested defendants who exert influence over defendant McCarthy's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendant McCarthy incapable of impartially considering a demand to commence and vigorously prosecute this action.

72.    The Finance Committee provides assistance to the Board in fulfilling its responsibilities with respect to the oversight of Beazer's financial matters. The Finance Committee is comprised of defendants Zelnak, B. Beazer and Leemputte. The Finance Committee caused or allowed the Company to engage in reckless lending practices. By allowing the Company to engage in reckless lending practices, these defendants have breached their fiduciary duties to the Company. Furthermore, the FBI is currently investigating the propriety of the Company's corporate and investment policies. Accordingly, defendants Zelnak, B. Beazer and Leemputte face a

sufficiently substantial likelihood of liability for their breaches of fiduciary duties and demand upon them is futile.

73.     Defendant B. Beazer served as the CEO of Beazer PLC, a United Kingdom Company that provided homebuilding, contracting, and real estate sales with annual revenue of approximately $3.4 billion.  By his specialized expertise in the design, building, sale of single-family homes, and mortgage origination services, defendant Beazer was in a unique position to understand the business of Beazer, as well as its internal controls, accounting practices, finances, markets and present and future business prospects.  This defendant, because of his unique qualifications, had a heightened duty to ensure the accuracy and fairness of Beazer's public statements and financials.  Nonetheless, defendant B. Beazer breached his duties by causing or allowing the improper public statements and financials described herein.  As a result of this defendant's breach of his duties, any demand upon him is futile.

74.     Defendant Leemputte is the Senior Vice President and CFO of Brunswick Corporation, a publicly traded global leader in the leisure products industry.  Because of his financial expertise as a CFO, defendant Leemputte was in a unique position to understand the financials of Beazer, as well as its internal controls, accounting practices, finances and both present and future business prospects.  Because of his unique qualifications, this defendant had a heightened duty to ensure the accuracy and fairness of Beazer's public financial statements.  Nonetheless, defendant Leemputte breached his duties by causing or allowing the improper public statements and financials described herein.  As a result of this defendant's breach of his duties, any demand upon him is futile.

75.     According to the Company's proxy statement filed January 3, 2007, defendant Leemputte is also designated as the Audit Committee's "financial expert" as defined by SEC regulations and New York Stock Exchange listing standards. Because of his financial expertise, defendant Leemputte was in a unique position to understand the business of Beazer, as well as its internal controls, accounting

practices, finances and both present and future business prospects. Because of his unique qualifications, this defendant had a heightened duty to ensure the accuracy and fairness of Beazer's public financial statements. Nonetheless, defendant Leemputte breached his duties by causing or allowing the improper public statements and financials described herein. As a result of this defendant's breach of his duties, any demand upon him is futile.

76.     The entire Beazer Board and senior management participated in the wrongs complained of herein. Beazer's directors are not disinterested or independent due to the following: defendants Alpert, Bayne, B. Beazer, Leemputte, Solari, Zelnak and McCarthy served on the Beazer Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above referenced defendants breached the fiduciary duties that they owed to Beazer and its shareholders in that they caused or failed to prevent and correct the internal control deficiencies, improper statements, and financials. It follows that the Beazer Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Beazer to potentially millions of dollars in liability for violations of applicable securities laws.

77.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

78.     The Director Defendants of Beazer, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Beazer's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

79.     In order to bring this suit, all of the directors of Beazer would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

80.     The acts complained of constitute violations of the fiduciary duties owed by Beazer's officers and directors and these acts are incapable of ratification.

81.     Each of the Director Defendants of Beazer authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

82.     Any suit by the current directors of Beazer to remedy these wrongs would likely expose the Individual Defendants and Beazer to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

83.     Beazer has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Beazer any part of the damages Beazer suffered and will suffer thereby.

84.     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against certain of them contained in class action complaints for violations of securities law, which admissions would impair the defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.   In essence, they would be forced to take positions contrary to the

defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile.

85.   If Beazer's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Beazer. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Beazer against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Beazer, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Beazer to sue them, since they will face a large uninsured liability.

86.   Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Beazer for any of the wrongdoing alleged by plaintiff herein.

87.   Plaintiff has not made any demand on shareholders of Beazer to institute this action since such demand would be a futile and useless act for the following reasons:

(a)   Beazer is a publicly held company with over 39 million shares outstanding, and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**Derivatively Against All Defendants for Violations of §10 (b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder**

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     During the Relevant Period, the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     As a result of the Individual Defendants' misconduct, Beazer has and will suffer damages in that it paid artificially inflated prices for Beazer common stock purchased on the open market. Beazer would not have purchased Beazer common stock at the prices it paid, had the market been aware that the market price of Beazer's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Beazer suffered damages in connection with its purchases of Beazer common stock during the Relevant Period. By reason of such conduct, the Individual Defendants are liable pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

91.     The Insider Selling Defendants also sold over 925,000 shares of Beazer's common stock at inflated prices during the Relevant Period, receiving over $10 million in proceeds, while in possession of material non-public information. These defendants misappropriated Beazer's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold

- 39 -

Beazer stock without disclosing the information alleged to have been concealed herein.

92.     At the same time the price of the Company's common stock was inflated by the Individual Defendants' misstatements and the Insider Selling Defendants were selling stock into the market, the Individual Defendants were causing Beazer repurchase $22.1 million worth of its own stock on the open market at inflated prices.

93.     As such, the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Beazer and others in connection with their purchases of Beazer common stock during the Relevant Period.

94.     As a result of the Individual Defendants' misconduct, Beazer has and will suffer damages in that it paid artificially inflated prices for Beazer common stock purchased on the open market.  Beazer would not have purchased Beazer common stock at the prices it paid, had the market been aware that the market price of Beazer's stock was artificially and falsely inflated by defendants' misleading statements.  As a direct and proximate result of these defendants' wrongful conduct, Beazer suffered damages in connection with its purchases of Beazer common stock during the Relevant Period.  By reason of such conduct, the Individual Defendants are liable pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Beazer common stock on the basis of such information.

97.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Beazer common stock.

98.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Beazer common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

99.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**COUNT III**

**Against All Defendants for Breach of Fiduciary Duty**

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    The Individual Defendants owed and owe Beazer fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Beazer the highest obligation of good faith, fair dealing, loyalty and due care.

102.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

103.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly allowed the Company to engage in reckless lending practices, misrepresented the financial results of the Company, and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

104.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Beazer has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

105.    Plaintiff on behalf of Beazer has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Abuse of Control

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    The Individual Defendants breached their fiduciary duties owed to Beazer because they abused their ability to control and influence over Beazer.  The Individual Defendants are legally responsible for their breaches of fiduciary duty.

108.    As a direct and proximate result of the Individual Defendants' abuse of control, Beazer has sustained significant damages.

109.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

110.    Plaintiff on behalf of Beazer has no adequate remedy at law.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

111.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.   As a result of the Company's reckless lending practices, lack of internal controls, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Beazer to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers, paying unjustified severance packages to executives involved in reckless lending, and incur potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

113.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

114.   Plaintiff on behalf of Beazer has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

115.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Beazer.

117.   Plaintiff, as a shareholder and representative of Beazer, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, waste of corporate assets, unjust enrichment and violations of the Exchange Act;

B.     Declaring that the Individual Defendants are liable under of §10(b) of the Exchange Act and Rule 10b-5 Promulgated thereunder and awarding Beazer damages;

C.     Directing Beazer to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Beazer and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

2.     control and limit insider stock selling.

D.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Beazer has an effective remedy;

E.     Awarding to Beazer restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 16, 2007

COHEN COOPER ESTEP & MUDDER, LLC

STEVEN J. ESTEP
Georgia Bar No. 250450
3350 Riverwood Parkway, Suite 2220
Atlanta, GA 30339
Telephone: (404) 814-0000
Facsimile: (404) 816-8900

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
DANIEL R. FORDE
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

ROY JACOBS & ASSOCIATES
ROY L. JACOBS
60 East 42nd Street, 46th Floor
New York, NY 10165
Telephone: (212) 867-1156
Facsimile: (212) 504-8343

Attorneys for Plaintiff

183664_3 DOC

VERIFICATION

I, Marc M. Umeda, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the above entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 11th day of April, 2007, at San Diego, California.

                                              MARC M. UMEDA